# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

BRAYAN ALEXANDER LOPEZ-RIVAS,

  Petitioner,

v.

ERNESTO SANTACRUZ, JR., et al.,

  Respondents.

No. 5:26-cv-02169-AYP

**ORDER GRANTING PETITIONER'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**

Pending before the Court is Brayan Alexander Lopez-Rivas's ("Petitioner") Ex Parte Application for Temporary Restraining Order ("TRO"). (Dkt. No. 6). Petitioner seeks a temporary restraining order for release from Department of Homeland Security ("DHS") and ICE custody following his re-detention without constitutionally adequate notice or process, and to prevent his removal to a third country without an opportunity to present a fear-based claim. Respondents, Ernesto Santacruz Jr. et al., filed an Answer on May 4, 2026. (Dkt. No. 10.) Petitioner filed a Reply on May 5, 2026. (Dkt. No. 11.) For the reasons set forth below, Petitioner's TRO Application is GRANTED.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The following facts are taken from the Habeas Petition and the TRO

Application. (Dkt. Nos 1, 6.) Petitioner is a native and citizen of El Salvador, subject to a final order of removal, who entered the United States in 2019 after fleeing persecution and torture in El Salvador, his home country. (Dkt. No. 1 at 5.) He was apprehended approximately one mile west of the San Ysidro Port of Entry by U.S. Border Patrol. *Id*. Upon apprehension, Petitioner immediately expressed fear of return to El Salvador. *Id*. He was processed for credible-fear screening and, after a positive credible-fear determination, placed in removal proceedings. *Id*.

On April 23, 2019, DHS released Petitioner from initial border custody on an Order of Recognizance ("OREC") and enrolled him in the Intensive Supervision Appearance Program ("ISAP"), with GPS monitoring. *Id*. Petitioner reported as required for his initial ICE check-in on May 6, 2019, at which point ICE St. Paul re-detained him based on unverified allegations from Salvadoran authorities that he had been a member of an illicit group—the very allegations that formed the centerpiece of his subsequent claim for protection under the Convention Against Torture. *Id*.

On August 9, 2019, an Immigration Judge granted Petitioner withholding of removal under Article III of the Convention Against Torture ("CAT") and the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"). *Id*. The Immigration Judge designated El Salvador as the country of removal and entered a final order of removal but expressly granted CAT withholding precluding removal to El Salvador. *Id*.

The Immigration Judge's decision rested on findings that Petitioner had been falsely accused by Salvadoran authorities of gang affiliation, repeatedly arrested and detained for extended periods on those false accusations, subjected to inhumane detention conditions including overcrowding and pepper spraying, and threatened by gang members upon release—all of which made it more likely

2

than not that he would face torture upon return to El Salvador. *Id.*

Following the grant of CAT protection, on August 9, 2019, ICE released Petitioner on an Order of Supervision ("OSUP") pursuant to 8 U.S.C. § 1231(a)(3) and 8 C.F.R. § 241.5. *Id.* The OSUP required Petitioner, to appear in person at every scheduled ICE check-in, furnish written notice of any change of residence or employment within 48 hours, obey reasonable conditions, refrain from association with known gang members or criminal activity, and assist ICE in obtaining travel documents. *Id.* at 7.

From September 13, 2019, through April 14, 2026—a period of nearly seven (7) years—Petitioner faithfully complied with every condition of his Order of Supervision. *Id.* He never missed a check-in and never gave ICE any reason to question his reliability. *Id.*

On August 4, 2020, Petitioner timely filed Form I-765 (Application for Employment Authorization). U.S. Citizenship and Immigration Services ("USCIS") approved that application and, on September 7, 2021, issued his first Employment Authorization Document ("EAD") under category (a)(10) (withholding of removal). *Id.* Petitioner has had a valid EAD continuously from 2021 to the present and has been gainfully employed throughout that period, most recently with Avalon Landscaping Company since April 2024. *Id.* at 8.

In 2021, Petitioner relocated from Faribault, Minnesota to California in search of better employment opportunities. *Id.* Consistent with his obligations under the OSUP, Petitioner notified ICE of the change of address, completed all required paperwork to transfer his case, and continued to attend every scheduled ICE check-in at the Los Angeles Field Office. *Id.*

Petitioner has no criminal record. *Id.* He lives in the community with his partner and his young daughter, who came with him from Mexico in 2019, and recently began attending church. *Id.* Petitioner attended his most recent annual ICE check-in on September 4, 2025. *Id.* ICE instructed him to return on

3

March 4, 2026. ICE then telephoned Petitioner and rescheduled the appointment to April 14, 2026. *Id*. Throughout this period, ICE has not identified any change in circumstances, accused Petitioner of any violation of his OSUP, or alleged any new criminal conduct or gang affiliation, and never communicated—orally or in writing—any indication that his supervised release was at risk of revocation. *Id*.

On April 14, 2026, Petitioner appeared voluntarily for his rescheduled ICE check-in at the seventh-floor ICE field office located at 300 N. Los Angeles Street, Los Angeles, California. *Id*. at 9. Officers questioned him at length about whether he was an alcoholic, whether he had ever used drugs, whether he had ever been a gang member, whether he had any gang affiliations, and whether he had any tattoos. *Id*. Officers then took new fingerprints, despite already having his fingerprints on file since 2019. *Id*. When Petitioner asked whether there was any "problem," one officer responded that the "new administration" wanted to ask such questions and informed him that an immigration judge "wants to ask you a few questions." *Id*. Petitioner asked when he should return to see the judge; the officer responded that he could probably see the judge that same day or that Thursday. *Id*.

Officers then directed Petitioner to the basement of the ICE building. *Id*. at 10. He asked whether he was being detained but the officers refused to answer, stating only that "the judge will decide that." *Id*. As Petitioner was being escorted to the basement, officers handcuffed him and took a DNA sample by swabbing his saliva. *Id*. When Petitioner again asked whether he was being detained, the officer told him only that he would note in his report that Petitioner did not resist, but that he did not know whether Petitioner was being detained. *Id*. Petitioner was asked to sign a paper. *Id*. He initially refused but the officer offered to read the paper aloud to him in Spanish. *Id*. As read by the officer, the paper purportedly asked whether Petitioner was an alcoholic,

4

whether he used drugs, whether he had ever committed any crimes, and whether he had any gang affiliations. *Id*. Based on the officer's representations, Petitioner signed the paper, indicating "no" to each question. *Id*. When Petitioner asked whether he was "in trouble," the officer responded "no" but said "the judge wants to see you." *Id*.

The officers did not advise Petitioner that he was being arrested or detained, identify any violation of the OSUP, or provide any written notice regarding revocation of supervision. *Id*.

Once at the Adelanto ICE Processing Center, Respondents did not serve Petitioner with any document or written notice explaining the basis for his detention. *Id*. Petitioner was detained at the Adelanto ICE Processing Center, Adelanto, California from April 14, 2026, through the morning of April 28, 2026. (Dkt. No. 6 at 21.) After Petitioner filed the habeas petition on April 27, 2026, Dkt. No. 1, ICE transferred Petitioner out of this jurisdiction—without any notice to Petitioner, his counsel, or this Court—from the Adelanto ICE Processing Center to El Paso Camp East Montana early in the morning of April 28, 2026. (Dkt. No. 6. at 21.) Petitioner's TRO application informed the Court that he was moved to ERO El Paso Camp East Montana, out of this jurisdiction. (Dkt. No. 6. At 2.) This transfer was made without the required two court days' advance notice required by Central District of California General Order 26-05, issued by this Court on April 28, 2026. (Dkt. No. 5.)

Respondents filed their Answer to the Habeas Petition and their Opposition to the Ex Parte Application for TRO on May 5, 2026. (Dkt. No. 9.) That same day, they served Petitioner and this Court with Notice of Intended Removal of Petitioner to Mexico on May 4, 2026. (Dkt. No. 10.)

Petitioner alleges that his sudden detention without any pre-deprivation process, notice of revocation of his OSUP violates his due process. Further, he argues that because the Immigration Judge's 2019 grant of CAT withholding

5

remains in full force and effect, he may not be removed to El Salvador, and Petitioner fears Respondents intend to remove him to a third country without an opportunity to raise fear-based claims as to any third country, thus warranting immediate relief.

Respondents state that they intend to remove Petitioner to a third country, Mexico, in the next two days. (Dkt. No. 10.) Respondents argue Petitioner has not shown irreparable harm to warrant the TRO; and the balance of equities and public interest favors the Respondents.

Petitioner's re-detention and revocation of OSUP without adequate notice or a meaningful opportunity to be heard, warrants a grant of TRO. (Dkt. No. 1 at 10–11.) Further, in light of Respondent's intent to deport Petitioner to Mexico, the threatened removal is occurring without constitutionally sufficient process, causing ongoing and irreparable harm. The government has not provided Petitioner with a notice and a hearing to raise fear-based claims as to any third country and Petitioner has demonstrated urgency to warrant ex parte relief.

## II.    LEGAL STANDARD

Fed. R. Civ. P. 65 (b) governs temporary restraining orders. A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda City.*, 415 U.S. 423, 439 (1974). The purpose of a preliminary injunction, in turn, is to preserve the status quo and the rights of the parties until a final judgment on the merits can

be rendered. *See U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

The standard for a TRO is similar to the standard for a preliminary injunction. *Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc.*, 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009). To obtain a TRO or a preliminary injunction, the plaintiff must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted). Alternatively, where there are merely "serious questions going to the merits," the moving party may still obtain a preliminary injunction where the balance of hardships "tips sharply" in the moving party's favor, and where the moving party also shows a likelihood of irreparable injury and that an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Also, a TRO is a kind of ex parte application, so the moving party must "establish why the accompanying proposed motion for the ultimate relief requested cannot be calendared in the usual manner. In other words ... the moving party [must show why it] should be allowed to go to the head of the line in front of all other litigants and receive special treatment." *Mission Power Engineering Co. v. Continental Cas. Co.*, 883 F.Supp. 488, 492 (C.D. Cal. 1995) (explaining that the applicant for ex parte relief must demonstrate urgency and that it is without fault in creating the urgency).

## III.    RELEVANT LEGAL BACKGROUND

INA § 241(b)(3)(A) provides that "the Attorney General may not remove [a noncitizen] to a country if the Attorney General decides that the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's]

7

race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Despite the use of the word "may," this provision establishes a mandatory prohibition, not a discretionary one. See *Camposeco-Montejo v. Ashcroft*, 384 F.3d 814, 819 (9th Cir. 2004). The Ninth Circuit has consistently held that "withholding of removal is not discretionary" and that the Attorney General may not remove a noncitizen to a country where his life or freedom would be threatened on a protected ground. *Delgado v. Holder*, 648 F.3d 1095, 1101 (9th Cir. 2011). The Supreme Court has likewise recognized that relief must be granted where eligibility is established. *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

Similarly, regulations implementing the Convention Against Torture require protection where a noncitizen establishes that he is "more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(1). Where that standard is met, relief "shall be granted" absent narrow exceptions. 8 C.F.R. § 208.16(d)(1). Thus, both statutory withholding and CAT protection impose mandatory limits on the government's removal authority. *See Johnson v. Guzman Chavez*, 594 U.S. 523, 531 (2021).

Because these protections are mandatory, the government must provide a meaningful procedural mechanism for noncitizens to assert fear-based claims prior to removal. The governing regulations reflect this requirement. Where a noncitizen expresses fear of removal, the agency must refer the individual for a reasonable fear determination by an asylum officer. See 8 C.F.R. §§ 208.31(b), 241.8(e); *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 956 (9th Cir. 2012). These provisions use mandatory language, requiring that the noncitizen "shall be immediately referred" for such screening. 8 C.F.R. § 241.8(e). The purpose of this framework is to ensure that noncitizens are not removed without first

receiving an opportunity to establish eligibility for protection from persecution or torture.

On March 30, 2025, DHS issued "Guidance Regarding Third Country Removals" ("Noem Memo"),[1] which materially alters this process. ICE's Noem Memo and related directives permit removal based on diplomatic assurances deemed credible by the State Department, without any requirement that ICE affirmatively inquire whether the individual fears removal or ensure an individualized fear review. Noem Memo at 1–2. Any screening occurs only if the noncitizen affirmatively raises such fear, often on an expedited timeline. *Id*. This approach diverges from the regulatory framework, which is designed to ensure meaningful identification and adjudication of fear-based claims prior to removal. As a result, the procedures contemplated by the Noem Memo heighten the risk that noncitizens will be removed to countries where they face persecution or torture without adequate procedural safeguards.

On March 23, 2025, noncitizens filed *D.V.D. v. DHS*, a putative nationwide class action challenging DHS's third-country removal practices and alleging violations of 8 U.S.C. § 1231(b)(3), CAT, and the Due Process Clause. *D.V.D. v. DHS*, No. 1:25-cv-10676-BEM (D. Mass.). On April 18, 2025, the district court certified a nationwide class and issued a preliminary injunction requiring DHS to provide certain procedural protections prior to third-country removals. *Id*. at 378, 392–93. On June 23, 2025, the Supreme Court stayed the preliminary injunction pending further proceedings. *DHS v. D.V.D.*, 145 S. Ct. 2153 (2025). Following that stay, DHS issued interim guidance in July 2025 addressing implementation of third-country removal procedures ("July

---

[1] U.S. Dep't of Homeland Security, Guidance Regarding Third Country Removals (Mar. 30, 2025), available at https://immigrationlitigation.org/wp-content/uploads/2025/04/43-1-Exh-A-Guidance.pdf

Guidance Memo").[2] The July Guidance Memo is identical to the Noem Memo except that, in cases where diplomatic assurances do not exist, it provides that an officer will serve a "Notice of Removal" with interpretation. July Guidance Memo at 1. That guidance also provides that DHS may effectuate removal 24 hours after serving notice; however, "[i]n exigent circumstances," with approval from chief counsel of DHS or ICE, DHS may execute removal to the third country with a mere six hours' notice if ICE provides the noncitizen "means and opportunity to speak with an attorney." *Id.*

On February 25, 2026, the district court in *D.V.D.* entered final judgment setting aside DHS's third-country removal policy and concluding that certain procedural protections are required prior to third-country removals. *D.V.D. v. DHS*, No. CV 25-10676-BEM, 2026 WL 521557 at *44 (D. Mass. Feb. 25, 2026). The court declared that class members have the right to both "meaningful notice before removal to any third country" as well as "a meaningful opportunity to raise a country-specific claim against removal before removal to any third country." *Id.* That judgment, however, was also subsequently stayed. *See D.V.D., et al v. U.S. Department of Homeland Security, et al.*, No. 26-1212 (1st Cir.). The First Circuit has since granted an emergency stay and expedited briefing on appeal, which remains pending. *Id.*

## IV.   DISCUSSION

For the reasons set forth below, each of the governing factors for temporary injunctive relief weighs decisively in favor of Petitioner. Petitioner has demonstrated a strong likelihood of success on the merits of his claims, a

---

[2] *Third Country Removals Following the Supreme Court's Order in Department of Homeland Security v. D.V.D., No. 24A1153 (U.S. June 23, 2025)* (July 9, 2025), https://immigrationlitigation.org/wpcontent/uploads/2025/07/190-1-July-9-Guidance.pdf.

clear risk of irreparable harm absent relief, and that the balance of equities and the public interest favor maintaining the status quo.

### A. Likelihood of Success on the Merits

Petitioner puts forth two main claims: (1) that he was unlawfully re-arrested without adequate notice or pre-deprivation process in violation of the due process, warranting his immediate release under the conditions he has complied with for nearly seven years; and (2) that he must be provided with a constitutionally adequate, meaningful opportunity to apply for fear-based protection prior to removal to any third country. (Dkt. No. 6.) The Court finds that Petitioner has at least one feasible claim that he is likely to succeed on the merits of. Accordingly, the first *Winter* factor weighs in favor of Petitioner. The Court explains its reasoning below.

### 1. Violation of Fifth Amendment Due Process Claim

The Supreme Court has held that "the Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693, (2001). This fundamental principle means that "it is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025). Thus, the Supreme Court has held "the Due Process Clause protects a[ ] [noncitizen] subject to a final order of deportation[.]" *Zadvydas*, 533 U.S. at 693–694 (2001) (citing *Wong Wing v. United States*, 163 U.S. 228, 238, (1896).

"Immigration proceedings must provide the procedural due process protections guaranteed by the Fifth Amendment." *Vilchez v. Holder*, 682 F.3d 1195, 1199 (9th Cir. 2012) (citing *Lacsina Pangilinan v. Holder*, 568 F.3d 708, 709 (9th Cir. 2009)). "A 'noncitizen must be given sufficient notice of a country

11

of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation.'" *Nguyen v. Scott, et al.*, 796 F.Supp.3d 703, 727, (W.D. Wash. 2025) (quoting *Aden v. Nielsen*, 409 F.Supp.3d 998, 1009 (W.D. Wash. 2019) (citing *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976)). "[I]ndividuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence." *Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999)).

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Ed.*, 149 F.3d 971, 982 (9th Cir.1998). The first step is to determine whether the individual possesses a liberty or property interest that triggers due process protections. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). If such a constitutionally protected interest exists, the second step applies a three-step balancing test described in *Mathews v. Eldridge* to assess what procedural safeguards are required. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). Only after establishing a constitutionally protected interest does the analysis proceed to the second step.

It is salient to the Court that here, Petitioner possesses a liberty interest that triggers due process protections. ICE's authority to re-arrest a noncitizen who is at liberty is limited by the requirements of the Due Process Clause. *See Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("the government's discretion to incarcerate noncitizens is always constrained by the requirements of due process"). Moreover, individuals released from incarceration have a liberty interest in their freedom. *See e.g., TALIB ALI, Petitioner, v. JEREMY CASEY, et al., Respondents.*, No. 26-CV-01674-BAS-MMP, 2026 WL 892019, at *2 (S.D. Cal. Apr. 1, 2026) ("Individuals released from custody, even where such

12

release is conditional, have a liberty interest in continued liberty"); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (parolees); *Young v. Harper*, 520 U.S. 143, 150 (1997) (pre-parolees); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (probationers). Accordingly, this Court agrees with those courts that have held: [O]nce a noncitizen has been released, the law prohibits federal agents from rearresting him merely because he is subject to removal proceedings. Rather, the federal agents must be able to present evidence of materially changed circumstances—namely, evidence that the noncitizen is in fact dangerous or has become a flight risk, or is now subject to a final order of removal. And if the noncitizen disputes the notion that changed circumstances justify his rearrest, he is entitled to a prompt hearing before an Immigration Judge. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176–77 (N.D. Cal. 2017); *see also Kamalpreet v. Singh*, No. 26-cv-1211-LL-JLB, 2026 WL 622687, at *1 (S.D. Cal. Mar. 5, 2026) ("Although the initial decision to detain or release an individual may be within the government's discretion, the government's decision to release an individual from custody creates an implicit promise, upon which that individual may rely, that their liberty will be revoked only if they fail to live up to the conditions of release." (citation modified) (quoting *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025))). Thus, the Court concludes that Petitioner possesses a liberty interest that triggers due process protections.

Under *Mathews*, the "identification of the specific dictates of due process generally requires consideration of three distinct factors." *Id*. at 334–35. "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal

13

and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

### 1. *Private Interest*

The first Matthews factor—the private interests at stake—weighs in Petitioners' favor. "Although in some circumstances the initial decision to detain or release an individual may be within the government's discretion, the government's decision to release an individual from custody creates 'an implicit promise,' upon which that individual may rely, that their liberty 'will be revoked only if they fail to live up to the ... conditions of release." *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025) (quoting *Morrissey*, 408 U.S. at 482) (cleaned up). "Accordingly, a noncitizen release from custody pending immigration proceedings has a protected liberty interest in remaining out of custody." *Salcedo Aceros*, 2025 WL 2637503, at *6. To determine whether an individual's conditional release rises to the level of a protected liberty interest, courts have "compar[ed] the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*." *R.D.T.M. v. Wofford*, No. 1:25-cv-01141-KES-SKO, 2025 WL 2617255, at *3 (E.D. Cal. Sept 9, 2025).

Here, Petitioner has a substantial liberty interest in his continued release. Petitioner was granted CAT protection by an immigration judge and released from immigration custody on August 19, 2019. ICE released Petitioner on an Order of Supervision pursuant to 8 U.S.C. § 1231(a)(3) and 8 C.F.R. § 241.5. (*See* Dkt. No. 1 at 7, Ex. C at 24–29 (Order of Supervision).) As in *Morrissey*, Petitioner's release from immigration custody created an "implicit promise" that his liberty would not be revoked if he complied with the conditions of his release. 408 U.S. at 482. He has also developed a normal life having steady work, including with Avalon Landscaping Company since April 2024, and living with his partner and their seven-year-old daughter. (Dkt No. 6 at 19.) Petitioner was

14

released from immigration custody with a reasonable expectation that he would remain at liberty absent a material change in circumstances. He has not been arrested or charged with any criminal violations of the conditions of his release, and he has consistently complied with ICE check-in requirements and kept the agency informed of his whereabouts for nearly seven years. *See id* at 18–19. During that time, he has worked legally and consistently since receiving his Employment Authorization Document in 2021. *Id.* Indeed, it was Petitioner's compliance with the conditions of his release and routine ICE check-ins—appearing for his April 14, 2026 check-in—that led to his detention. *Id.* at 19–20. Accordingly, the first *Matthews* factor—the private interests at stake—weighs in Petitioners' favor.

### 2. Erroneous Deprivation

The second *Mathews* factor—the risk of erroneous deprivation through the procedures used—is similarly high. "[T]he risk of an erroneous deprivation [of liberty] is high" where, as here, "[the petitioner] has not received any bond or custody redetermination hearing." *A.E. v. Andrews*, No. 1:25-cv-00107-KES-SKO, 2025 WL 1424382, at *5 (E.D. Cal. May 16, 2025); *see also Sun v. Santa Cruz*, 2025 WL 2730235 at *6 (C.D. Cal. Aug 26, 2025); *Martinez v. Noem*, --- F.Supp.3d ----, 2026 WL 538034, at *5 (C.D. Cal. Feb. 23, 2026) (finding "the risk of erroneous deprivation is significant without a pre-detention hearing"). Civil immigration detention, which is "nonpunitive in purpose and effect[,]" is justified when a noncitizen presents a risk of flight or danger to the community. *See Zadvydas*, 533 U.S. at 690, 121 S.Ct. 2491; *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023); *see also Duong v. Kaiser*, 800 F. Supp. 3d 1030, 1041– 42 (N.D. Cal. 2025) (finding that the petitioner's prior detention and release on bond made his due process challenge "stronger because his initial

release was attributable to an individualized determination that he was not a flight risk or a danger to his community").

Here, Petitioner has been re-detained without any hearing or oversight from a neutral adjudicator. Respondents fail to show that Petitioner is a flight risk or danger to his community to justify his re-detention. Accordingly, the second *Mathews* factor weighs in favor of Petitioner.

*3. Government's Interest*

The third Mathews factor—the government's interests—also favors Petitioner. Respondents' interest in arrest and re-detention without a hearing is low. *See, e.g., E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025) ("The Court finds that the Government's interest in re-detaining non-citizens previously released without a hearing is low: although it would have required the expenditure of finite resources (money and time) to provide Petitioner notice and hearing on ATD violations before arresting and re-detaining him, those costs are far outweighed by the risk of erroneous deprivation of the liberty interest at issue."); *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("If the government wishes to re-arrest [petitioner] at any point, it has the power to take steps toward doing so; but its interest in doing so without a hearing is low."). Respondents do not assert that it had any basis to re-detain Petitioner pursuant to Petitioner being a flight risk or danger to the community under *Zadvydas*. *See Zadvydas*, 533 U.S. at 690; *see also Bell v. Wolfish*, 441 U.S. 520, 538 (1979) (detention is not reasonably related to the purpose of mitigating flight risk where there are alternatives to detention that could mitigate such risk). Therefore, the third *Matthews* factor also tips in favor of Petitioner. Thus, all three *Mathews* factors support Petitioner. Petitioner has

16

therefore demonstrated a likelihood of success on the merits of his first Fifth Amendment due process claim sufficient to satisfy the first Winter factor.

Respondents argue that the TRO Application should be denied because it fails to show that there is no significant likelihood of removal in the reasonably foreseeable future, as required by *Zadvydas v. Davis*, 533 U.S. 678 (2001). (Dkt. No. 9.) However, *Zadvydas* is inapposite because Petitioner does not challenge the duration or lawfulness of his continued detention under an indefinite-detention theory, but instead challenges the constitutionality of the procedures used to effectuate his re-detention and imminent third-country removal. Petitioner is not asserting that his detention has become indefinite, and it is undisputed that he has been in custody only since April 14, 2026. Rather, Petitioner contends that his re-detention was effectuated without constitutionally adequate pre-deprivation process, including meaningful notice and a meaningful opportunity to contest the basis for custody and to assert fear-based protection claims prior to any removal to a third country. Accordingly, Respondents' arguments are misplaced and the Court finds that Petitioner has shown likelihood of success on his claim that that he was unlawfully re-arrested without adequate notice or pre-deprivation process in violation of the Fifth Amendment.

### 2. Violation of Mandatory Fear-Based Protection Claim

Petitioner also asserts that Respondents' third country removal policy, without providing notice, an opportunity to raise fear-based claims, or any other procedural protection as set forth in DHS policy, is unlawful.[3] (Dkt. No. 1 at 15.) Respondents "are not presenting an opposition" to Petitioner's request for an

---

[3] At the time Petitioner submitted his TRO, when he was already in custody, Respondents had not informed him of their intent to remove him to a third country. (Dkt. No. 6.) Respondents only informed Petitioner of their intent to remove him to a third country, Mexico, on May 4, 2026. (Dkt. No. 10.)

injunction prohibiting Petitioner's transfer to a third country absent notice and an opportunity to be heard on the matter. (Dkt. No. 9 at 8.) In effect, Respondents lack of opposition, is a concession that the injunction should be granted. *See Singh v. Warden Desert View Annex, et al.*, No. 26-cv-00440-FMO-AJR, Dkt. 9 (C.D. Cal. Feb. 9, 2026) (granting petition where "the court construes respondents' failure to address petitioner's due process claim as a concession of petitioner's argument"); *Soleimani v. Larose*, No. 25-cv-3082-DMS-DEB, 2025 WL 3268412, at *3 (S.D. Cal. Nov. 24, 2025) (granting petition because, "[b]y failing to respond to the claims actually asserted, Respondents have conceded the claims"). *See also N-E-M-B v. Wamsley*, No. 3:25-cv-989-SI, 2025 WL 3527111, at *1 (D. Or. Dec. 9, 2025) ("Respondents do not challenge any aspect of the Petition on the merits and thus the Court finds that Respondents have waived such challenges and conceded those aspects of the Petition."). Petitioner is likely to succeed on this claim.

The Fifth Amendment requires meaningful pre-removal procedural protections before a noncitizen may be removed to a third country not designated in the original removal order. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025). The Ninth Circuit has held that where removal implicates potential persecution or torture, due process requires notice and a meaningful opportunity to present fear-based claims before removal is executed. *See Andriasian v. I.N.S.*, 180 F.3d 1033, 1041 (9th Cir. 1999); *see also Ibarra-Perez v. United States*, 154 F.4th 989, 995 (9th Cir. 2025) ("DHS must also 'notify individuals who are subject to deportation that they have the right to apply for asylum in the United States and for withholding of deportation to the country to which they will be deported';

18

otherwise, DHS violates their constitutional right to due process." (quoting *Andriasian*, 180 F.3d at 1041)

Congress and the implementing regulations establish mandatory procedures designed to safeguard these rights. 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.31. Under 8 U.S.C. § 1231(b)(3), the government may not remove a noncitizen to any country where the individual's life or freedom would be threatened on account of a protected ground, and parallel protections apply under the Convention Against Torture regulations ("CAT"). 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(c).

Consistent with these obligations, noncitizens who express fear of return are entitled to a reasonable fear screening before an asylum officer, followed by immigration judge review if the determination is negative. 8 C.F.R. § 208.31(c)–(d). In the context of reinstated removal orders, the regulations impose a mandatory referral requirement such that a noncitizen who expresses fear "shall be immediately referred" to an asylum officer for a reasonable fear determination. 8 C.F.R. § 241.8(e). The Ninth Circuit has recognized that this provision creates a nondiscretionary procedural safeguard requiring immediate referral upon an expression of fear. *Ortiz-Alfaro v. Holder*, 694 F.3d 955, 956 (9th Cir. 2012) ("§ 241.8(e) creates an exception by which [a noncitizen] who asserts 'a fear of returning to the country designated' in his reinstated removal order is 'immediately' referred to an asylum officer who must determine if the [noncitizen] has a reasonable fear of persecution or torture in accordance with 8 C.F.R. § 208.31"). The regulations further require that, absent exceptional circumstances, the reasonable fear determination be conducted within ten days of referral. 8 C.F.R. § 208.31(b).

Courts have repeatedly held that due process is violated where third-country removal procedures fail to provide adequate notice and a meaningful opportunity to raise fear-based claims before removal is executed. *See, e.g.,*

19

*Kumar v. Wamsley*, No. C25-2055-KKE, 2025 WL 3204724, at \*9 (W.D. Wash. Nov. 17, 2025); *Gomez v. Mattos*, No. 2:25-CV-00975-GMN-BNW, 2025 WL 3101994, at \*6 (D. Nev. Nov. 6, 2025); *Vishal v. Chestnut*, 811 F. Supp. 3d 1179, 1188 (E.D. Cal. 2025). Accordingly, these courts have found that the government's third country removal policy as outlined in the Noem Memo and July Guidance Memo violates due process and is contrary to Ninth Circuit precedent. *See, e.g., Kumar*, 2025 WL 3204724, at \*6 (noting "overwhelming authority against" the policy); *Vu v. Noem*, No. 1:25-cv-01366-KES-SKO (HC), 2025 WL 3114341, at \*9 (E.D. Cal. Nov. 6, 2025) ("ICE's policy is contrary to Ninth Circuit precedent.... Other courts in this circuit have recognized that this policy is unconstitutional, and this Court agrees with those well-reasoned decisions."); *Nguyen*, 796 F.Supp.3d at 728 ("This policy contravenes Ninth Circuit law, as laid out above. It would be impossible to comply both with Ninth Circuit precedent and the policy."). These decisions emphasize that meaningful process requires advance written notice of the proposed third-country designation and a genuine opportunity to present a fear-based claim before removal proceeds. *See Elshourbagy v. Bondi*, No. 2:25-CV-02432-TL, 2025 WL 3718993, at \*7 (W.D. Wash. Dec. 23, 2025) (citing *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1019 (W.D. Wash. 2019)).

Some courts have also concluded that the availability of post-determination mechanisms, such as motions to reopen, does not cure the constitutional deficiency where pre-removal process is inadequate. *See, e.g., A.A.M. v. Andrews*,--- F.Supp.3d ----, 2025 WL 3485219, at \*11 (E.D. Cal. Dec. 4, 2025); *Baltodano v. Bondi*, No. C25-1958RSL, 2025 WL 3484769, at \*6 (W.D. Wash. Dec. 4, 2025). Instead, due process requires that fear-based claims be meaningfully adjudicated before removal to a third country is effectuated,

including the opportunity to pursue withholding or CAT protection in proceedings before an immigration judge. *Baltodano*, 2025 WL 3484769, at \*6.

Against this backdrop, Petitioner has shown a likelihood of success on the merits of his claim that Respondents' actions and policies fail to afford constitutionally adequate process. The record reflects that Respondents have already initiated removal to a third country—Mexico—thereby triggering Petitioner's right to meaningful pre-removal procedures, including adequate notice and a genuine opportunity to present fear-based claims before removal is effectuated. Dkt. No. 10.; see also *Andriasian*, 180 F.3d at 1041. The Immigration Judge's 2019 order designated only El Salvador. (Dkt. No. 6. At 31.) No alternative country was designated, and no third country has ever been identified to Petitioner. *Id.* Respondents provided notice of removal to Mexico after Petitioner was detained and after he was transferred out of this district. (Dkt. No. 10.) After-the-fact notice does not satisfy the constitutional requirement where, as here, the timing and circumstances of that notice risk depriving Petitioner of a meaningful opportunity to be heard. *See Elshourbagy*, 2025 WL 3718993, at \*7. In light of the expedited timelines contemplated by the challenged policies, including removal on as little as 24 hours' notice, the Court finds that Petitioner has raised a substantial likelihood that the procedures employed are constitutionally deficient as applied to him.

Respondents have already issued a notice of removal to Mexico, and indicated their intent to proceed, but have not provided notice of removing Petitioner from this jurisdiction, rendering the risk of an imminent procedural deprivation concrete and immediate.[4] (Dkt. No. 10.) Under these circumstances,

---

[4] The General Order for the Central District specifically requires that that "[d]uring the pendency of an § 2241 Immigration Petition, the government shall provide at least two court days' notice to the petitioner, his or her counsel, *and the Court* of its *intent to remove the petitioner from the Central District of California.*" (cont'd . . .)

21

and considering the weight of authority within this Circuit finding materially similar policies unlawful, the Court concludes that Petitioner is likely to succeed on the merits of his claim that Respondents' third-country removal procedures violate the INA and the Due Process Clause. Petitioner has therefore demonstrated a likelihood of success on the merits of his sufficient to satisfy the first *Winter* factor.

### B. Likelihood of Irreparable Injury

"It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (cleaned up) (quoting from treatise). Moreover, it is clear and self-evident that removal to a country where torture is a possibility constitutes serious and irreparable harm. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 391 (D. Mass. 2025) ("Here, the threatened harm is clear and simple: persecution, torture, and death. It is hard to imagine harm more irreparable."). Accordingly, the second *Winter* factor favors Petitioner.

### C. Balance of Equities and Public Interest

As with irreparable injury, when a Petitioner establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor

---

(Dkt. No. 5 at 6 (emphasis added).) Moving a petitioner to a different detention center in a different state qualifies as removing them from the Central District. This Court reminded Respondents of the General Order and its requirements on April 30, 2026. (Dkt. No. 7.) Petitioner was removed out of this jurisdiction to Texas one day after the day after the filing of Petitioner's Habeas Petition. (Dkt. No. 6 at 21.)

22

[injunctive relief].” *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Respondents would not suffer any hardship if the TRO were issued because the government “cannot suffer harm from an injunction that merely ends an unlawful practice[.]” *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Moreover, it is neither “equitable [n]or in the public's interest to allow ... [violation of] the requirements of federal law, especially when there are no adequate remedies available.” *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (quoting *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). Courts have recognized that there is a strong public interest in preventing removal to countries where individuals may face serious harm. *See Villanueva-Bustillos v. Marin*, 370 F. Supp. 3d 1083, 1090 (C.D. Cal. 2018) (“there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm” (citing *Nken v. Holder*, 556 U.S. 418, 436 (2009))). The public has an interest in the execution of immigration laws, but that interest does not outweigh “an interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.” *Nken*, 556 U.S. at 436; *see also Ovsepian*, No. 5:25-cv-01937-MEMF-DFM, at *14–15 (“Although there is a countervailing ‘public interest in prompt execution of removal orders,’ it is well established that ‘our system does not permit agencies to act unlawfully even in pursuit of desirable ends[.]’ ”). As such, the balance of the equities and public interest tips in favor of Petitioner.

### D. Court's Discretion in Waiving Bond

Rule 65(c) provides that a court may require a party seeking injunctive relief to post security “in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.” Fed. R. Civ. P. 65(c). Despite this mandatory phrasing,

"Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (emphasis in original). A court may dispense with a bond altogether "when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* (quoting *Jorgensen*, 320 F.3d at 919). Courts have also waived security where requiring a bond "would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public." *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

Here, the Court cannot identify any monetary harm Respondents would suffer as a result of the injunction, and none is apparent from the record. Whereas here, Petitioner has demonstrated a likelihood of success on the merits and the injunction safeguards fundamental due process rights, requiring a bond would serve no protective purpose and would risk burdening access to constitutionally grounded relief. *See Couturier*, 572 F.3d at 1086; *Baca*, 936 F. Supp. at 738. Accordingly, the Court WAIVES the bond requirement.

## V.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Petitioner's Application for a Temporary Restraining Order.

IT IS HEREBY ORDERED that:

1. Respondents are ORDERED to immediately release Petitioner from Respondent's custody, along with his personal belongings, subject to appropriate conditions of supervision that existed prior to his detention on April 14, 2026;

2. Respondents are ENJOINED and restrained from redetaining Petitioner absent constitutionally adequate pre-deprivation notice and a hearing at which the Government must justify the need to confine by clear and convincing evidence that Petitioner is a danger to the community or a flight risk before Petitioner may be re-detained;

3. Respondents are ENJOINED from removing Petitioner to a third country without notice and an opportunity to be heard;

4. Petitioner is not to be removed from this jurisdiction until a final disposition is made of this matter;

5. Respondents are further ORDERED to show cause, why a preliminary injunction should not be issued. Parties are to submit briefing by Wednesday, May 20, 2026, and;

6. The parties shall file a joint status report no later than seven (7) days from the date of this Order confirming that Petitioner has been released from Respondents' custody.

IT IS SO ORDERED.

DATED:   May 7, 2026

_____
ANNA Y. PARK
UNITED STATES MAGISTRATE JUDGE

25